**FILED**
**CLERK**

11:01 am, Aug 07, 2017

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
JOANNE BENTIVEGNA,

               Plaintiff,

        -against-

PEOPLE'S UNITED BANK, PEOPLE'S
UNITED INSURANCE AGENCY, INC., DAN
CASEY, LOUISE SANDBERG, JOHN
BARNES,

               Defendants.

-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:14-cv-599 (ADS)(GRB)

**APPEARANCES:**
**Leeds Brown Law P.C.**
*Attorneys for the Plaintiff*
1 Old Country Road
Suite 347
Carle Place, NY 11514
      By:    Andrew George Costello, Esq.,
             Rick Ostrove, Esq., Of Counsel

**Jackson Lewis, P.C.**
*Attorneys for the Defendants*
58 South Service Road
Suite 250
Melville, NY 11747
      By:    Ana Shields, Esq.,
             Mark S. Mancher, Esq.,
             Mordy Yankovich, Esq., Of Counsel

**SPATT, District Judge:**

The Plaintiff Joanne Bentivegna (the "Plaintiff") brought this employment discrimination

action against the Defendants People's United Bank ("PUB"), People's United Insurance Agency,

Inc. ("PUIA", and with PUB, "People's United")), Dan Casey ("Casey"), Louise Sandberg

("Sandberg"), and John Barnes ("Barnes") (collectively, the "Defendants"), alleging that they

discriminated against her based on her gender in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*.

Presently before the Court is a motion by the Defendants for summary judgment pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56. For the following reasons, the Defendants' motion is granted in part, and denied in part.

## I. BACKGROUND

### A. The Relevant Facts

The following facts are drawn from the Defendants' Second Revised Rule 56.1 Statement of Material Facts and Plaintiff's Counter-Statement (ECF No. 81-1) (the "SMF").

PUB is a national banking association. PUIA is an insurance agency that is a wholly owned subsidiary of PUB. Casey is the President and Chief Executive Officer of PUIA. Sandberg was the Senior Executive Vice President in charge of the Wealth Management Division at PUB. Sandberg retired in June 2013. Barnes is the Chief Executive Officer of PUB.

Bentivegna worked for PUIA from January 2011 until August 2013.

Before becoming an employee of PUIA, the Plaintiff worked for the Bank of Smithtown. When the holding company for the Bank of Smithtown was merged into the holding company for PUIA, Bentivegna became an employee of PUIA.

The Plaintiff became an employee of the Bank of Smithtown in April 2004 when she, John Mulvey ("Mulvey"), and Barry M. Seigerman ("Seigerman") sold their insurance agency, Seigerman-Mulvaney, to the Bank of Smithtown through a stock purchase and sale agreement (the "Purchase Agreement"). Bentivegna and her co-owners received payouts proportional to their ownership interests, and became employees of the Bank of Smithtown. The Purchase Agreement referenced an Employment Agreement (together, the "Agreements"). The Plaintiff signed the

Purchase Agreement, and it is undisputed that the Plaintiff agreed to the terms of the Purchase Agreement.

In part, the Purchase Agreement stated that:

Each of the Shareholders covenants that during the period of time that he or she is employed by the Corporation after the Closing Date, [she] shall not engage as an agent, broker, independent contractor, employee or consultant in a company that is not affiliated with [Seigerman-Mulvaney] or become a director, officer, member or partner in a corporation, limited liability company, partnership or other type of entity, which is in the business of selling insurance products and services and/or offering mutual fund investment services.

Each of the Shareholders covenants that for a period of three (3) years from the date of termination of his or her employment with [Seigerman-Mulvaney], [s]he shall not engage as an agent, broker, independent contractor, employee or consultant in a company or become interested, either directly or indirectly, as an owner, director, officer, member, or partner in a corporation, limited liability company, partnership or other type of entity, which is in the business of selling insurance products and services and/or offering mutual fund investment services in the following counties in New York State: Suffolk, Nassau, Queens, Kings, New York, or [Richmond].

Each of the Shareholders covenants that for a period of three (3) years from the date of termination of [] his or her employment with [Seigerman-Mulvaney], [s]he shall not solicit the business of any person or entity that was a client of the Corporation on the date of the termination of [her] employment with the Corporation.

(SMF ¶¶ 19–21; Defs.' Ex. D1 (the Purchase Agreement) ¶¶ 8.1–8.3). The parties do not appear to dispute that the restrictive covenants contained in the Purchase Agreement were still applicable to the Plaintiff after PUB acquired the Bank of Smithtown.

Casey testified at his deposition that he first met the Plaintiff in August 2010, which was before the closing of the sale of the Bank of Smithtown to PUB. In November 2010, Bentivegna, along with other members of the Bank of Smithtown insurance agency, were invited to Hartford to meet with Casey and other members of PUB's insurance management team.

A member of the Bank of Smithtown agency emailed Casey to say that he would be unable to attend, and Casey responded, in part, "I think you are just trying to avoid hanging out with three chatty girls." (SMF ¶ 24). It is undisputed that Casey was referring to the Plaintiff and two other

women from the Bank of Smithtown office. The Plaintiff, who did not work for People's United at the time, did not complain to anyone at People's United.

On November 16, 2010, the Plaintiff and two other female Bank of Smithtown employees met with Casey in Hartford. The Plaintiff met alone at some point with Casey. After the meeting, the group went out to dinner. When Casey observed that the Plaintiff was not drinking, he said to her, "Man up Joanne, have a drink."

After dinner, Casey and another PUIA employee drove away from the restaurant, but stopped next to one another at a traffic light. At the traffic light, Casey exited his vehicle, ran to the front of his male co-worker's car, pounded on his chest and said twice, "Oh you want a piece of this?" When the light changed, the two drivers drove off at a high rate of speed. The Plaintiff states that Casey and the other PUIA employee had done a lot of drinking.

The Plaintiff, who was still not employed by People's United at this time, did not formally complain to anyone. Two days later, on November 18, 2010, the Plaintiff emailed Casey and said:

> I have not had a chance until now to send you a thank you for the time spent with me on Tuesday discussing my future and the future plans for PUIA. Our discussion ha[s] me focused in a good direction and I am excited about the future opportunities for myself and the staff working under your leadership.

(*Id.* ¶ 30; Defs.' Ex. D3).

In January 2011, PUIA was formed. Casey became the CEO of PUIA. Essentially, PUIA merged four regional insurance agencies that had been purchased by PUB: RC Knox and Company ("RC Knox"), Beardsley, Brown & Bassett ("BBB"), Chittenden Insurance Group ("Chittenden") and Bank of Smithtown Insurance Agents & Brokers, Inc.. BBB was a part of RC Knox.

Casey testified that insurance salespeople, also known as producers, who had worked at RC Knox or Chittenden had different commission structures than other PUIA employees, because they had preexisting contracts with their former agency. The RC Knox commission structure was

a tiered one, which began at 25%, and increased depending on the producer's volume of sales, and went up to 34%. Chittenden producers were paid at a 25% rate.

The Plaintiff provided a spreadsheet, (Pl.'s Ex. 6), which she claims shows that producers at RC Knox and Chittenden were not paid at uniform rates. However, the document is not authenticated by any witness. It is unclear whether the spreadsheet was compiled by the Plaintiff, her attorneys, or the Defendants. As the document has no foundation, and is complete hearsay, the Court declines to consider it. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." (quoting FED. R. CIV. P. 56)).

The Defendants claim that, except for new producers and the RC Knox producers, the other producers were placed on the "Chittenden" plan. The Chittenden plan producers were paid a 25% commission on new business and renewed business. The Plaintiff contends that there were two Chittenden producers who were not paid according to the 25% flat rate, but as stated above, she does not point to admissible evidence to support that contention.

The Plaintiff had been paid a salary of $185,000 as President of the Bank of Smithtown Insurance Agents and Brokers. She was not paid any commission in that position. Although the Plaintiff was not a producer at the Bank of Smithtown, she testified that she functioned as a producer and had a book of business that exceeded $1 million. (Pl.'s Ex. 5 ¶¶ 8–9).

When the Plaintiff joined PUIA, Casey assigned accounts to the Plaintiff that she had requested, and the Plaintiff was charged with servicing those accounts. In December 2010, Casey made a written compensation offer to the Plaintiff which included a 25% commission rate for new

and renewal policies. Casey told the Plaintiff that by January 2011, all producers would be on the same plan, which was the Chittenden plan. It was estimated that the Plaintiff would earn $272,436.75 in 2011. She earned $281,256.15 in 2011. (Defs.' Ex. E ¶ 10).

In December 2010, the Plaintiff was given a production sheet (the "Production Sheet'), which listed the Plaintiff's 2011 salary base, and stated that her commission for new and renewal business would be 25%. The Production Sheet stated that it was "[s]ubject to signature of fully executed Employment Agreement to follow." (Defs.' Ex. D4). The Plaintiff signed the Production Sheet on December 21, 2010.

The Defendants state that none of the former Bank of Smithtown producers who joined PUIA were offered a higher commission rate than the Plaintiff. In response, the Plaintiff points to exhibit 6 to support her claim that one of the Bank of Smithtown male producers was paid a $40,000 salary on top of his commission. Again, the Plaintiff has not provided any foundation for exhibit 6.

Sometime later in 2011, about the middle of the year, Casey implemented a new business incentive plan. However, despite what he had told the Plaintiff, he did not put all producers on a flat 25% commission rate. Casey said that he was concerned about a backlash from top producers who previously had better incentive plans.

Casey testified that producers who had worked for RC Knox were paid according to the tiered structure under which they had been previously compensated. New producers were subject to a different salary structure because they did not have a book of business and therefore a commission would not supply them with sufficient money. Those who had been placed on the Chittenden Plan or who had worked for Chittenden continued to receive a flat 25% commission; and everyone except new producers was eligible for a new business bonus.

Bentivegna testified that a new producer, Peter Rossi, received a commission rate of 50%. Casey testified that Rossi received a commission of 25% on new and renewal business, and that he was also paid a salary because Rossi's book of business was so small that he could not survive on commission alone.

On January 4, 2011, the Plaintiff emailed Casey and said:

> I am in the process of arranging my strategic planning meetings for the consulting clients that I handle directly without any staff involvement. Please note that the consulting fees involved were not included in the production numbers provided to and used for the renewal compensation. They are usually one[-]time items and only occur on an as needed basis.
> I have a total of $53,050 to be negotiated with clients this month for 2011. Please recognize that through this process additional lines are obtained and written throughout the year. I am recommending a split of 75% [Bentivegna] /25% Agency. This will give the agency $13,000 with no overhead expense. There could be additional fees involved during the year but most are billed first quarter.

Casey replied:

> Your deal is 25% across the board. This is insurance activity performed as part of your employment with PUIA regardless of [whether] it is a fee or a commission.
> I put together a very fair, and considerably better deal for you than you had in the past and this is just another component of that.

(SMF ¶ 50).

On January 20, 2011, in an email to Julie Spencer, a producer, the Plaintiff said, "[t]here's more to come – the goal is to have a woman at the top of the list by year[']s end! The boys might actually have to work!! Ha Ha!!" (*Id.* ¶ 53).

In February 2011, Casey sent an email to all PUIA employees in which he congratulated the Plaintiff and her office for winning "the first month's new business competition." (*Id.* ¶ 54).

That same month, February 2011, the Plaintiff learned that Casey had told producers at a Connecticut sales meeting that there was a "girl on Long Island kicking your butts." (*Id.* ¶ 55). The Plaintiff was not present at the meeting. Louise Sandberg, who was the Plaintiff's supervisor,

told Casey that the Plaintiff was uncomfortable being singled out in that manner, especially with explicit reference to her gender.

The Plaintiff called Casey to complain about the comment, and Casey did not deny making the comment. About that time, the Plaintiff also began to complain that male producers were being paid higher commission rates than her.

In early 2011, the Plaintiff began complaining that she believed that top male producers were being paid higher commissions. She testified that PUB's Chief Financial Officer Brian Loveless ("Loveless") sent an email to Maryanne Reinhardt, asking Reinhardt to tell the Plaintiff to stop asking about the pay disparity.

The Plaintiff did not know whether women who were paid under the RC Knox plan were eligible for commission rates higher than 25%. The Defendants state that women on the RC Knox plan *were* eligible for higher commission rates, and gave Julie Spencer as an example of a woman who earned more on the RC Knox plan. The Plaintiff states, citing again to the spreadsheets in exhibit 6, that Judith Howard, who was on the RC Knox plan, was only paid a flat commission rate of 20%.

In April 2011, Casey emailed the Plaintiff congratulating her on her success in the first quarter of 2011. He wrote to her, "[t]errific job on all fronts! You are doing a great job for us, and I appreciate all of your hard work." (*Id.* ¶ 60). On April 25, 2011, Casey replied to an email from the Plaintiff in which she informed him that she had secured some new business, "I love you, sincerely, Dan (note please take your husband out to your favorite restaurant and send me the bill. I am treating … seriously) Great work!" (*Id.* ¶ 61). The Plaintiff testified that she did not know whether Casey would have written such a statement if she were a man, but assumed that Casey would not say to a male producer, "I love you." (Defs. Ex. J at 253).

In June 2011, an individual named Jim Campbell ("Campbell"), who worked for a firm called Reagan Associates, spoke with the Plaintiff about one of his client's interest in purchasing an insurance agency. It is not clear from the record in what type of business Reagan Associates engages. The Plaintiff suggested that Campbell client, United Nations Federal Credit Union ("UNFCU") purchase ICC, an agency with which the Plaintiff had a long relationship. ICC is another insurance agency. The Plaintiff testified that that ICC was similar in size to PUIA, but that ICC did not compete with PUIA in the Long Island market, and that she had "never in [her] career run up against [ICC] as another competitor that [she] had to bid something against them." (*Id.* at 178).

In July 2011, during a meeting, producer Kevin Foster listed several businesses in Connecticut that PUIA could solicit, stating, "[w]e can do the University of Hartford, or Siemens, or we can do the Girl Scouts." Casey laughed and said "[w]e only want to 'do' one of those." In response to Casey's comment, Foster said "[w]ell, maybe we could 'do' two." (SMF ¶ 63). The Plaintiff told Casey that she thought his comment was inappropriate. Although the Plaintiff did not file a formal complaint at that time, she listed this incident in a formal complaint and in a later email.

On July 27, 2011, Casey told Bentivegna that she was being moved to the higher commission RC Knox plan effective August 2011. Casey informed her of this immediately after the Plaintiff had complained to him about the alleged pay disparity between her and other male producers. Casey responded to the Plaintiff's complaint by saying, "[o]h, Joanne, you know, you really know how to spoil a surprise. You know, I was just talking to Louise about putting you on the super duper producer program." (Defs.' Ex. J at 127). At that time, Casey also directed that two male producers be moved from the Chittenden Plan to the RC Knox plan—Cortland Jones and

Peter Clark.  The Plaintiff contends, and cites to exhibit 6 for support, that Jones and Clark's raises were made retroactive to January 2011.  However, there is no admissible evidence that supports this contention.

Casey testified that he had discussed the Plaintiff's commission with Sandberg, and Sandberg thought the Plaintiff should receive the higher commission rate.

The Plaintiff told Casey that she wanted the rate raise to be retroactive to January, because she said other male producers had been paid at that rate since that time.  Casey testified that he discussed the issue with Sandberg, and that they decided that the rate raise would take effect in August 2011.  However, Casey also testified that he sent an email to the Plaintiff in which he stated that the PUIA board held a meeting on August 2, 2011, during which the board approved the Plaintiff's new contract.  The Plaintiff contends that the PUIA board therefore decided when the Plaintiff's rate increase would take effect.

In August 2011, Casey gave the Plaintiff an employment contract (the "Contract"), and asked her to sign it.  The Contract included many non-compete clauses, as well as a clause that discontinued the Plaintiff's commissions in the event that she was terminated.  That clause provided that "[u]pon termination of employment of Employee . . . , Employee's compensation shall accrue to Employee up to the effective date of such termination and shall be paid forthwith thereafter."  (Defs.' Ex. D11 ¶ 12).

There is some dispute as to whether Casey or Sandberg knew about the Plaintiff's requirement to not compete with PUIA as a result of the Purchase Agreement.  Casey testified that, even as late as July 2012, he did not know that the Plaintiff allegedly had a non-compete clause.  Sandberg similarly testified that she was unaware at the time that the Plaintiff, despite not signing the Contract, had a non-compete requirement in the Purchase Agreement.  The Plaintiff testified

that Casey had told her either in 2010 or 2011 that her non-compete clause was unfair and they would get rid of it.  In further support of her contention that Casey and Sandberg knew that she was bound by a non-compete, the Plaintiff cites to a number of the Bank of Smithtown's public filings.  However, the Plaintiff does not state how it logically follows that Casey and Sandberg knew every word that was in those public filings.

While the Plaintiff knew that a non-compete provision appeared in the Purchase Agreement, she did not believe that she was bound by it in her role at PUIA until "after all [of] this happened."  (SMF ¶73; Defs.' Ex. J at 30).

On September 20, 2011, Casey named the Plaintiff as the Chair of PUIA's Agency Producers Council.  In October 2011, he named the Plaintiff a sales team leader.  The sales team leaders were tasked with sharing information between experienced and less-experienced producers.

In February 2012, the Plaintiff states that while at a restaurant with Casey and other producers, Casey said, "I'll take two of those" when a hostess wearing a low-cut blouse approached them.

In March 2012, the Plaintiff met with Stephen Ryerson ("Ryerson"), the President of UNFCU, because UNFCU was looking to acquire insurance agencies.  The meeting was set up by Jim Campbell of Reagan Associates.  In an email dated March 15, 2012, Ryerson said that the Plaintiff was a huge producer.  Ryerson testified that he wanted UNFCU to acquire ICC, and then have the Plaintiff join ICC in an executive and production role.  He further testified that he always understood that the Plaintiff was subject to a restrictive covenant, and that he was not interested in having the Plaintiff work for ICC as long as she had a restrictive covenant in place.  To that end,

Ryerson testified that the Plaintiff had informed him that she was talking with PUIA about an amicable separation.

On May 19, 2012, the Plaintiff met with Sandberg. Sandberg had been looking to meet with the Plaintiff to discuss why she had not signed the Contract and non-compete agreement. Sandberg testified that the Plaintiff "indicated in that meeting that the driver of not signing it was a lack of fear and a lack of understanding of the corporate vision and a lack of belief that the company was being managed properly and a difficult relationship – interpersonal relationship between she and [Casey]." (Defs.' Ex. E at 53).

The Plaintiff testified that, at the meeting she also told Sandberg:

> I brought up that I had just come from Hartford, and I said and what are we going to do about what happens in this agency from, you know, you recognize that there is issues with the guys in Hartford and the way that men treat women in this agency. It is like a freaking frat house in Hartford is what it is like. And I explained to her some of the situations that had occurred. And she goes, Joanne, listen, you know what Dan is like. It is just Dan. You know, like, we need to work together to make sure that we take care of Dan. I'm going to talk to Dan about this. Don't worry, I'll talk to Dan. It was fluffed off. She never responded to that. And then they set the meeting up to come and get the contract signed.

(Defs.' Ex. J at 227). Sandberg admitted in her deposition that Casey had a "very dry sense of humor, which most people enjoy, but which didn't work with Joanne." (Defs.' Ex. H at 57).

In June 2012, while visiting the PUIA office in Hartford, the Plaintiff saw a poster in the break room which she believed was sexually offensive. The poster prominently displayed a woman's cleavage, and did not show her face. The Plaintiff complained about the poster and threw it in the garbage. The Plaintiff states that she was told that others had complained about the poster but that nothing was done. As this statement is hearsay, the Court does not consider it for the purposes of this motion.

The poster apparently was hung by a woman, and was an advertisement for a local theater group production. After the poster was taken down by the Plaintiff, it was replaced by a poster that displayed a woman from the waist down, wearing fishnet stockings, and holding handcuffs. PUIA does not have any records of complaints about the poster made to its ethics hotline.

On July 13, 2012, Sandberg and Casey met with the Plaintiff on Long Island to once again discuss the fact that she had not yet signed the Contract. Before the meeting, Casey had spoken to the employees of the Plaintiff's branch. He said that the branch and the Plaintiff were having a good year and added, "[w]e are happy that Joanne is successful despite the fact that she is a woman." (SMF ¶ 89).

After the group meeting, the Plaintiff, Casey, and Sandberg went out to lunch. The Plaintiff testified that both she and Casey were defensive, and that Casey screamed until he was red in the face. (Defs.' Ex. J at 260, 265). The Plaintiff further testified that Casey told her that "the only reason you make the money you make is because of me. The only reason your family is better off is because of me, and because of what I've done for you." (*Id.* at 260).

Casey left the Plaintiff a voicemail sometime after the lunch meeting in which he said:

> What we're going to do is we're going to defer this conversation for a while and you know, let's just, uh, keep doing what we're doing and hopefully I can gain your confidence and support down the road a little bit and we can talk about this at another time. We've got a lot of things going our way and I don't want to let this stop the positive flow that's going on right now.

(SMF ¶ 91).

On August 29, 2012, Ryerson emailed another UNFCU executive and said that "it would be a good idea to . . . provide a status report on the [ICC] acquisition and related plans to retain Joanne Bentivegna." (*Id.* ¶ 92). An offer proposal was attached to the email. The proposal included a substantial payment to the Plaintiff for her $1.25 million book of business, a

management position, and a higher rate of commission than she received at PUIA. UNFCU also proposed to hire two of the Plaintiff's co-workers, including Jennifer Langeloh ("Langeloh"), who was to be an immediate hire.

However, the specifics of this offer were never communicated to the Plaintiff; she never saw the offer proposal; and UNFCU never made an employment offer to the Plaintiff.

On October 17, 2012, in an email sent to Sandberg, the Plaintiff said that she believed that "accounts belong to whomever the client wants." (*Id.* ¶ 95). The Plaintiff also catalogued the purported acts amounting to a hostile work environment and discrimination in her email. This was the first time the Plaintiff made a written complaint about any such acts. The Plaintiff did not allege that any inappropriate conduct happened in between July and October 2012.

The Plaintiff's complaint was assigned to Human Resources Vice President Trisha Keltos-Kelly ("Keltos-Kelly"). Keltos-Kelly scheduled a meeting with the Plaintiff for November 6, 2012. On October 31, 2012, the Plaintiff informed Ryerson of her internal complaint with UPIA, and the upcoming meeting with Keltos-Kelly. At their meeting on November 6, 2012, the Plaintiff provided Keltos-Kelly with a document entitled "Notes for meeting about Sexual Harassment and Sex Discrimination," which was a compilation of notes that the Plaintiff had taken regarding her allegations.

Keltos-Kelly also interviewed Casey and Sandberg. Based upon her three interviews, Keltos-Kelly found there was sufficient evidence that Casey made inappropriate comments. As a result, Casey was issued a "written verbal" warning, and Keltos-Kelly recommended that PUIA conduct an agency-wide training on inclusion. After that, Keltos-Kelly told the Plaintiff that the investigation was complete and, as far as PUIA was concerned, the appropriate steps were taken.

On November 26, 2012, the Plaintiff sent an email to Keltos-Kelly informing her that the Plaintiff's attorney had advised her to file a charge of discrimination and retaliation.

The Defendants state that on December 5, 2012, the Plaintiff met with a licensed social worker who took notes while meeting with the Plaintiff. The Plaintiff states that the notes are hearsay, and the Defendants argue that they are statements against interest. The notes are "double hearsay"—that is, there are two levels of hearsay. The first level is the Plaintiff's statements. They are not hearsay because they were statements made by the Plaintiff and are being offered as evidence by the opposing party. Therefore, the Plaintiff's statements are not hearsay and are admissible under Federal Rule of Evidence ("FED. R. EVID.") 801(d)(2)(A). The social worker's notes, however, have not been authenticated by either the Plaintiff or her social worker. The Defendants seek to enter them into evidence with an affidavit from Defendants' counsel who says that they are a true and accurate copy. However, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56. Defendants' counsel cannot, by his own affidavit, provide a foundation for the Plaintiff's social worker's notes because he cannot testify that they are a true and accurate copy. Therefore, the Court declines to consider the social worker's notes.

On December 7, 2012, the Plaintiff filed a complaint with the New York State Division of Human Rights (the "NYSDHR" or the "Division"). The Plaintiff did not make any further complaints directly to PUIA about alleged harassment or discrimination.

On December 20, 2012, a notice was sent to all PUIA staff asking them to participate in an "Inclusive Leadership" training, which was going to be an eight-hour session with follow-up assignments.

On December 28, 2012, UNFCU purchased ICC.

In January 2013, the Plaintiff was reassigned to be the sales leader of a group in Bridgeport, Connecticut. She had previously been the sales leader of a group in Hartford, Connecticut. The sales leader positions were voluntary positions, and the reassignment did not financially impact the Plaintiff.

On January 28, 2013, Ryerson wrote in an email to other UNFCU employees that he was going to meet with the Plaintiff the next day. Ryerson and the Plaintiff had previously written emails to each other setting up a meeting.

On January 31, 2013, Casey asked Mark Fries, a Connecticut producer, to attend a networking meeting with PUB's lending division in New York City. The Plaintiff complained that she should have been sent to the meeting. She was later sent to a different meeting in Long Island.

On February 26, 2013, Langeloh resigned from PUIA and was hired by ICC. Casey testified that after Langeloh left, PUIA wanted to fill the position immediately. Despite that desire, the vacancy was not filled until about six months later in August 2013, after the Plaintiff was terminated. PUIA posted the vacancy on March 6, 2013, and received approximately thirty applications between that date and July 5, 2013. Sixteen of those thirty applications were forwarded to Laura Senn, who was charged with filling the vacancy. The Plaintiff interviewed two people to fill the position, but did not recommend either for hire. The Plaintiff said that she wanted to see additional candidates.

On June 10, 2013, the Plaintiff emailed Ryerson to update him on the status of her discrimination claim against PUIA. She further told him that she intended to file for a declaratory judgment on the validity of her restrictive covenant.

In June 2013, Sandberg retired, and Jeffrey Tengel ("Tengel") assumed Sandberg's responsibilities at PUIA.

On July 5, 2013, Langeloh's former position was offered to Krystal Haney.

In July 2013, Tengel directed that the PUIA IT Department review the Plaintiff's emails. Tengel testified that "[i]n [his] previous experience, it[] [is] common practice" to review a departing salesperson's emails to determine whether customer information had been shared. (Defs.' Ex. M at 17). He said that he had no reason to suspect that the Plaintiff had shared any customer information that would put PUIA at a competitive disadvantage, but nevertheless he had the IT Department search because he believed it was routine. Tengel testified that he had previously directed the IT Department to search other departing salesperson's emails.

On July 16, 2013, PUB's Chief Information Security Officer, Stephen Fried ("Fried") wrote to Tengel:

> Jeff,
> Following up on the voice mail I left you this morning, I received a message from Fran yesterday indicating you may have a litigation situation with an employee. We can search an employee's email store and (potentially) file storage. To do that we'll need a formal request and permission from HR (Tricia) specifying the name of the employee and Employee ID along with an indication of what you are looking for and any keywords or phrases you want searched within the data set.
> Send the request to Bob Shemo and we'll get started...

(SMF ¶ 132). Tengel testified that the Plaintiff was the employee referenced in the email, and that the "litigation situation" was the theft of corporate assets. Although the Plaintiff says Casey testified that the email search was done because of the NYSDHR complaint, Casey did not so testify. He instead testified that Tengel was concerned that because the Plaintiff had filed a complaint and did not have a signed contract, he therefore wanted to ensure that no confidential information had been taken. He did state that he thought the Plaintiff might leave PUIA because of "everything that was going on," including the NYSHDR determination. (Defs.' Ex. I at 150).

However, Michael Collier, the Chief Operating Officer at PUIA, testified that he was tasked with reviewing the Plaintiff's emails, and that he had never been previously asked to perform such a review.

On July 18, 2013, Robert Shemo from the PUIA IT Department sent an email to Casey, Tengel, Keltos-Kelly, and others, in which he said:

> After a quick look at Joanne's email, it is apparent that she has been sending a significant amount of business information to a personal address, iobentiveanalacmail.com over the last several months. You can see a sample of the sent items in the image below. I will be out of the office tomorrow, but will be able to extract emails for review early next week if you would like to see details of the attachments.
> Bob

(SMF ¶ 132; Defs.' Ex. D27). In response to a question from Tengel about whether it was a problem, Shemo responded via email that "[i]t is a very big problem. I've seen this frequently when salespeople are getting ready to leave and want to take customers with them." (SMF ¶ 134).

The review also showed that the Plaintiff and Mulvey were both "involved" with another company, WLF Consulting LLC ("WLF"). WLF provided insurance consulting services to commercial insurance customers. Mulvey stated in his affidavit that WLF performed insurance coverage consulting, which was not a service offered by PUIA. In contrast, Mulvey said, PUIA performed claim management consulting.

Mulvey had incorporated WLF as a separate business on December 18, 2012, while still employed by PUIA. The Plaintiff was working as an unpaid consultant helping Mulvey. The Plaintiff used a WLF email address to conduct WLF business while she worked at PUIA, and her email signature identified her as a consultant. The Plaintiff testified that the President of the Bank of Smithtown had given her and Mulvey permission to work with WLF.

Subsequently, Mulvey registered WLF for a property/casualty broker license with New York State.  The evidence introduced by the Defendants shows that WLF was so licensed since July 17, 2015.

Although the Plaintiff says that she had permission from the President of the Bank of Smithtown, she never asked for permission from PUIA to consult for WLF, and never informed PUIA about WLF's existence.

The Plaintiff received $12,800 in consulting fees from clients that she did not disclose or contribute to PUIA.  The Plaintiff testified that Casey had told her that the agency would expect to receive 75% of any fees she received from consulting.  The Plaintiff argues that this only applied to clients that she "handled directly," but she does not cite to any evidence that stands for that proposition.  However, Casey's email to her does state "Your deal is 25% across the board. This is insurance activity performed as part of your employment with PUIA regardless of [whether] it is a fee or a commission."  (Defs.' Ex. D5).

The review of the Plaintiff's emails revealed several incidents that concerned PUIA: the Plaintiff received consulting fees from customers and did not disclose them; the Plaintiff conducted consulting business without PUIA's knowledge; the Plaintiff had a PUIA employee run a comprehensive confidential customer report to possibly give to ICC—however, it does not appear that she gave the report to ICC; the Plaintiff emailed client information to her personal email address, including client renewal dates and coverage information; and the Plaintiff was regularly communicating with, and helping, Langeloh, who had left PUIA for ICC.

On July 3, 2013, the Plaintiff emailed Campbell a spreadsheet which contained her entire book of business.  On July 10, 2013, ICC gave the Plaintiff an ICC telephone extension.  On July 12, 2013, the Plaintiff emailed a customer using her ICC email address, even though the Plaintiff

still worked at PUIA, and told the customer to coordinate with Langeloh. On July 17, 2013, the Plaintiff sent a broker of record letter to a customer to move an account from PUIA to ICC. Langeloh emailed the Plaintiff and said "I want to make sure People's is not monitoring you." (SMF ¶ 151).

On August 1, 2013, PUIA representatives met with Mulvey to discuss what they had found. Mulvey admitted that WLF was a separate business; that he had accepted fees for his consulting work there and had not disclosed or contributed those fees; and that the Plaintiff had also provided services to clients at WLF. Mulvey was placed on administrative leave that day.

That same day, PUIA Loveless and Human Resources Manager Deborah Gross ("Gross") met with the Plaintiff about the emails. The Plaintiff was placed on administrative leave on August 1, 2013.

PUB CEO Jack Barnes ("Barnes") wrote in an email on August 1, 2013:

> As long as we do not let too much time go by before we fire her for [] her actions as I know them and file claims for the cost we have incurred defending her charges. I want to be very, very aggressive in this situation. She has cost us a lot of management time and expense and we need to be compensated. She and her accompli[c]es have stolen or attempted to steal corporate assets. Let discuss after the next interview but she should be out the door tomorrow based on what I know now. Jack

(*Id.* ¶ 161).

On August 19, 2013, the Plaintiff and Mulvey were terminated. It is undisputed that Sandberg was not involved in the decisions to place the Plaintiff on administrative leave and terminate her. The Plaintiff claims that Casey was involved in the decisions to place her on administrative leave and to terminate her. In contrast, the Defendants state that he was not involved in either decision. Neither party offers any evidence to support their respective positions about Casey's role.

There is a dispute as to whether the Plaintiff has been paid all commissions she is owed. Casey testified in his affidavit that the Plaintiff "has been all commissions on business she wrote which was both written and paid before her termination date." (Defs.' Ex. E ¶ 61). Conversely, the Plaintiff stated in her affidavit that she has not been paid all commissions due to her because, while she was employed at PUIA, she was remunerated as her clients paid PUIA. She avers that since she did not have a written contract with PUIA, she did not receive full commissions up front, but as her clients' payments came in. The Plaintiff was paid for commissions received by PUIA from August 21, 2013, through September 30, 2013, but was not paid for any commissions received by PUIA after that date. The Plaintiff argues that she is due any commissions on PUIA accounts that she originally secured and renewed after she was terminated. The Plaintiff provided several affidavits from insurance producers who stated that it is common practice for producers to receive commissions after they depart from their agency.

## B. Relevant Procedural Background

On December 7, 2012, the Plaintiff filed a complaint with the New York State Division of Human Rights (the "NYSDHR" or the "Division"). On June 6, 2013, the NYSDHR issued a determination after investigation, in which the Division stated that there was probable cause that People's United and Casey had engaged in discriminatory practices. On October 30, 2013, the NYSDHR issued a notice and final order of dismissal for administrative convenience.

On November 25, 2013, the United States Equal Employment Opportunity Commission (the "EEOC") issued a dismissal and notice of rights, because the Plaintiff wished to pursue her remedies in federal court.

On January 28, 2014, the Plaintiff filed a complaint in the instant suit. The initial complaint did not name Barnes as a Defendant. Her original complaint numbered six claims, but a review of

those claims revealed that there were more than six. The Plaintiff alleged that People's United created a hostile work environment; discriminated against her on the basis of her gender by terminating her and by paying her less than her male coworker; and retaliated against her, all in violation of Title VII, and the New York State Human Rights Law, N.Y. EXEC. LAW § 296 (the "NYSHRL"). The Plaintiff alleged that Casey and Sandberg aided and abetted in the above mentioned discrimination and retaliation in violation of the NYSHRL. The Plaintiff also alleged that the Defendants' wage discrimination violated the Equal Pay Act, 29 U.S.C. §206(d), *et seq.* (the "EPA"). The Plaintiff also brought a claim under the New York Labor Law (the "NYLL"), claiming that the Defendants failed to pay her wages that she was owed. Finally, the Plaintiff brought common law claims for breach of contract and unjust enrichment against PUB and PUIA.

On November 3, 2015, after obtaining the Court's permission, the Plaintiff filed an amended complaint which added Barnes as a Defendant, and alleged that he violated the NYSHRL by aiding and abetting the gender discrimination and retaliation purportedly perpetrated by People's United.

On January 6, 2017, the Defendants filed their instant motion for summary judgment pursuant to Rule 56 dismissing the Plaintiff's claims.

## II. DISCUSSION

### A. The Legal Standard for Summary Judgment

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock*

*Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)). In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Barrows v. Seneca Foods Corp.,* 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd,* 678 F.3d at 174 (internal quotation marks omitted)). The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for that party. *See Dawson v. Cty. of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

**B. Application to the Plaintiff's Claims**

**1. As to the Plaintiff's Hostile Work Environment Claims**

The Defendants argue that the incidents which form the basis of the Plaintiff's hostile work environment claims are insufficiently severe or pervasive and therefore the claims must be dismissed as a matter of law. In opposition, the Plaintiff contends that one of the incidents of which she complains is sufficient for the Court to find that a question of fact exists on such claims, and that the totality of the incidents therefore requires that her hostile work environment claims be presented to a jury. The Court finds that there are sufficient questions of fact as to the Plaintiff's hostile work environment claims.

To establish a hostile work environment claim under federal and New York State law, a plaintiff must demonstrate that the conduct at issue created an environment that is both objectively and subjectively hostile. *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *White v. Fuji Photo Film USA, Inc.,* 434 F. Supp. 2d 144, 154–155 (S.D.N.Y. 2006). Therefore, the Plaintiff must not only allege that she found the environment offensive, but that a reasonable person also would have found the environment to be hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

To those ends, she must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations and quotation marks omitted); *Patterson v. Cty. of Oneida,* 375 F.3d 206, 227 (2d Cir. 2004); *see also Forrest v. Jewish Guild for Blind*, 3 N.Y.3d 295, 305, 310–11, 786 N.Y.S.2d 382,

819 N.E.2d 998, (N.Y. 2004) (applying the standard for New York state law claim of hostile work environment).

Courts must look at the totality of the circumstances to determine whether an environment is "hostile" or "abusive" and should consider: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's "work performance." *Harris,* 510 U.S. at 23.

Even when a plaintiff establishes that he was exposed to an objectively and subjectively hostile work environment, "[]he will not have a claim . . . unless []he can also demonstrate that the hostile work environment was caused by animus towards [him] as a result of [his] membership in a protected class." *Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper*, 281 F. Supp. 2d 689, 704 (S.D.N.Y. 2003); *see also Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 273 (E.D.N.Y. 2009) (stating that incidents comprising a hostile work environment claim must occur under circumstances where the "incidents can reasonably be interpreted as having taken place on the basis of that trait or condition").

Here, the Plaintiff has identified eight specific incidents over the course of approximately nine incidents over the course of about 20 months. These incidents included: Casey emailing several people, including the Plaintiff, that a male co-worker did not want to meet with three chatty girls; Casey telling the Plaintiff to "man up" and drink at a bar, and later that night banging on his chest while running around a car and shouting at a co-worker on the street; Casey said that a girl in Long Island was kicking other employees' butts; Casey implied that his group wanted to "do" the girl scouts; Casey saying at a restaurant that he would "take two of those," referencing a female hostess' breasts; the hanging of a poster prominently featuring a woman's cleavage but not her

face—and the poster being replaced by one that depicted a woman in fishnet stockings; Casey telling the Plaintiff's entire office, in front of her, that he was happy that she succeeded "despite being a woman;" Casey allegedly telling the Plaintiff that she only makes money because of him, and her family is better off because of him; and Casey brought a less qualified male producer to a networking meeting. The Plaintiff mentioned two other "incidents" in her memorandum of law, but she does not cite to any admissible evidence that Casey either told other producers that they cannot drink with female clients or that he distributed leads to male producers first. Although the Plaintiff cites to her unverified complaint in support of these contentions, an unverified complaint is not admissible evidence. *See Sloane v. Getz,* 2002 WL 31132968, at *1 (S.D.N.Y. Sept. 25, 2002) ("Because [plaintiff's] original, amended, and second amended complaints were unverified, they may not serve as affidavits for purposes of summary judgment.") (citing *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir. 2000)); *Yearwood v. LoPiccolo,* 1998 WL 474073, at *5 (S.D.N.Y. Aug.10, 1998) (stating that "no effect need be given at summary judgment" to an unverified complaint) (footnote omitted).

As to her subjective feelings, the Plaintiff stated that she was "embarrassed, ashamed, and humiliated." (Pl.'s Ex. 5 ¶ 37). The Defendants contend that the Plaintiff could not have subjectively felt that the atmosphere was pervasively hostile because she did not complain about every event. However, many of these events occurred as the Plaintiff was attempting to establish herself at her new job, or even before she began working for the Defendants. The Plaintiff complained informally to Sandberg on multiple occasions, and eventually filed a formal complaint. Drawing all ambiguities in her favor, as the Court must on a motion for summary judgment, the Court concludes that the Plaintiff has presented sufficient evidence to allow a trier of fact to conclude that she subjectively perceived her work environment as hostile.

While there is no bright line for how many incidents establish that a workplace was objectively "permeated with discriminatory intimidation, ridicule, and insult . . . ." *Harris*, 510 U.S. at 21, in the Court's view, there is a sufficient question of fact as to whether these incidents reached that level. Although the Defendants call these incidents "isolated," the Court cannot view each separate incident in isolation. As the Second Circuit has said:

> The court must take care [] not to view individual incidents in isolation. In assessing the evidence to determine whether a rational juror could infer that a reasonable employee would have found the abuse so pervasive or severe as to alter her working conditions, especially in the context of a claim of sexual harassment, where state of mind and intent are at issue, the court should not view the record in piecemeal fashion. The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experienced by its target.

*Redd*, 678 F.3d at 176 (2d Cir. 2012) (internal citations, quotation marks, and alterations omitted). In the Court's view, taken together, the events create a question of fact as to whether the Plaintiff's employment was sufficiently hostile so as to violate Title VII.

Indeed, because "the line between boorish and inappropriate behavior and actionable sexual harassment . . . is admittedly indistinct, its haziness counsels against summary judgment." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (internal citations omitted); *see also Patterson,* 375 F.3d at 227 ("Where reasonable jurors could disagree as to whether alleged incidents . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) ("The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact. Summary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions."

(internal citations, quotation marks, and alterations omitted)). "The interpretation of ambiguous conduct is 'an issue for the jury.'" *Redd*, 678 F.3d at 178 (quoting *Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir. 1998)).

Casey belittled the Plaintiff because of her gender in front of male co-workers on more than one occasion, and made sexually inappropriate comments several times in front of the Plaintiff. The Plaintiff actively sought employment elsewhere while she worked at PUIA, and a rational juror could find that she did so because her working conditions were so altered by the hostile work environment. The relationship between the Plaintiff and Casey had become so hostile after these incidents that Sandberg often intervened and appeared to serve as a mediator between the two.

There is no doubt, and the Defendants do not otherwise argue, that the Plaintiff was subjected to the comments and the environment because of her gender. Indeed, in every incident listed above, either the Plaintiff's gender was explicitly referenced, or a female was referenced or displayed in a derogatory manner.

As to the individual Defendants, the Defendants argued in their memoranda that the hostile work environment claims against the individual Defendants fail because there was no discrimination and no hostile work environment. As the Court has found that a question of fact exists as to whether there was such a hostile work environment, the Defendants' argument necessarily fails. The Defendants did not address, and did not move for summary judgment on the issue of whether the individual Defendants aided and abetted. Also, the Plaintiff did not brief the issue. As a result, the Court need not, and does not, address this issue at this time.

Therefore, the Plaintiff has presented sufficient facts to withstand the Defendants' motion for summary judgment on her hostile work environment claims. Accordingly, that portion of the Defendants' motion is denied.

**2. As to the Plaintiff's Discrimination Claims**

As stated above, the Court reads the Plaintiff's complaint to state a cause of action for discrimination under Title VII and the NYSHRL based on her termination as well as pay disparity. Her "first claim for relief," which contains all of her causes of action under Title VII, and her NYSHRL claims against People's United, states:

> 128. Defendants discriminated against Plaintiff with respect to compensation, terms, conditions, and privileges of employment, because of Plaintiff's sex/gender.
> 129. Defendants subjected Plaintiff to a hostile work environment, adverse actions and/or an atmosphere of adverse actions, which included, *inter alia*: placing Plaintiff on administrative suspension, terminating her, paying her less than similarly situated men, failing to provide her appropriate support staff, investigating her for activities that are common amongst her colleagues, bringing the State Court Action against her, and failing to pay her wages because of her sex/gender and/or in retaliation for engaging in protected activities and for making a charge and participating in an investigation and proceeding under Title VII of the Civil Rights Act and the New York State Human Rights Law.
> 130. Plaintiff has been damaged and continues to be damaged as a result of Defendants' violations of the Title VII and the New York State Human Rights Law.

(Am. Compl. ¶¶ 128–30). While the Plaintiff was not clear in delineating her causes of action, it is fair to draw from the structure of her first "claim for relief" and the factual circumstances that she alleges that her termination was the result of discrimination. Both Title VII and the NYSHRL provide, in relevant part, that it is unlawful to discriminate against someone because of their race or gender "with respect to his compensation, terms, conditions, or privileges of employment . . . ." 42 U.S.C. §§ 2000e–2(a)(1); N.Y. Exec. L. § 296(1)(a) ("It shall be an unlawful discriminatory practice . . . for an employer . . . because of an individual's . . . race [or] . . . sex . . . to discriminate against such individual in compensation or in terms, conditions or privileges of

employment."). "Terms, conditions or privileges of employment," is often used as shorthand for having a job. Indeed, the "privilege" of being employed is having a job. The Plaintiff stated that the Defendants discriminated against her with respect to the terms, conditions, and privileges of employment. Therefore, the Plaintiff has brought a claim under Title VII and the NYSHRL for discrimination based on her termination.

However, the Defendants have moved for summary judgment only on the Plaintiff's "disparate pay" discrimination claims. Therefore, the Court will only analyze the Plaintiff's discrimination claims based on the alleged disparate pay issue. As the Defendants did not move for summary judgment on the Plaintiff's discrimination claims based on her termination, those claims will necessarily survive the Defendants' motion for summary judgment.

Conversely, while the Court does not read the Plaintiff's complaint to allege a cause of action for wage discrimination under the NYLL, both sides briefed the issue. Therefore, as the parties appear to agree that such a cause of action exists in the complaint, the Court will analyze whether such claim survives the Defendants' motion for summary judgment pursuant to Rule 56.

### a. The Applicable Law for Wage Discrimination Under the EPA and NYLL

To prove a violation of the EPA, a plaintiff must first establish a *prima facie* case of discrimination by showing that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254–55 (2d Cir. 2014) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (internal alterations omitted)).

Under the EPA, proof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her claim. *See Pollis v. New School for Social Research,* 132 F.3d 115, 118 (2d Cir.1997). Thus, a *prima facie* showing gives rise to a presumption of discrimination.

Once a plaintiff makes out a *prima facie* case under the EPA, the burden shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses provided under the EPA: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). "Further, to successfully establish the "factor other than sex" defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender‑neutral factor that brought about the wage differential." *Belfi*, 191 F.3d at 136 (internal citations omitted).

Finally, the Plaintiff can counter the employer's affirmative defense by showing that the proffered reasons are a pretext for discrimination. *Id.*

NYLL claims for pay disparity are evaluated under the same standard as the EPA. *Volpe v. Nassau Cnty.,* 915 F. Supp. 2d 284, 291 n. 5 (E.D.N.Y. 2013) (citing *Rose v. Goldman, Sachs & Co.,* 163 F. Supp. 2d 238, 243 (S.D.N.Y. 2001)).

### b. The Applicable Law for Wage Discrimination Under Title VII and the NYSHRL

A claim for disparate pay under Title VII and the NYSHRL is analyzed under similar standards as the EPA, except under Title VII and the NYSHRL, a plaintiff must show that the disparate pay was motivated by a discriminatory animus. *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 528 (2d Cir. 1992) ("In order to establish a valid claim under Title VII for sex-based wage discrimination, a plaintiff can demonstrate a disparate impact from use of a facially neutral employment practice, or present evidence of intentional sex-based wage discrimination. (internal

citation omitted)).  Similar to EPA claims, there is a burden-shifting structure.  The burden shifting

structure was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792,

93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

To establish a *prima facie* case of wage discrimination under Title VII and the NYSHRL,

a plaintiff must show that she was a member of a protected class; she was qualified for the job in

question; she was paid less than members outside of the protected class for the same work; and the

employer's decision to pay the plaintiff less occurred under circumstances that give rise to an

inference of discrimination.  *Belfi,* 191 F.3d at 139–40.

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate

a legitimate, non-discriminatory reason for the pay differential.  *Id.*  If the defendant succeeds on

its burden, the presumption of animus "drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks,*

509 U.S. 502, 510–11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The plaintiff must then show

that the defendant's actions were the result of impermissible discrimination.  *Holcomb v. Iona*

*Coll.,* 521 F.3d 130,138 (2d Cir. 2008).  "The plaintiff need not prove that the explanation offered

by the employer was entirely false 'but only that . . . [the defendant's] stated reason was not the

only reason' and that consideration of an impermissible factor 'did make a difference.'"  *Phillips*

*v. Dow Jones & Co.,* No. 04 Civ. 5178, 2009 WL 2568437, at *9 (S.D.N.Y. Aug. 17, 2009)

(*quoting Montana v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir. 1989)).

However, "[a] plaintiff cannot merely rationalize, explain, or disagree with an employer's

proffered non-discriminatory reasons to survive summary judgment."  *Ehrbar v. Forest Hills*

*Hosp.*, 131 F. Supp. 3d 5, 29 (E.D.N.Y. 2015); *see also Cardo v. Arlington Cent. Sch. Dist.,* 473

F. App'x 21, 23 (2d Cir. 2012) ("While Cardo disputes the specifics of some of the incidents cited

by defendants, he does not deny that these incidents occurred, and offers no evidence that the

District did not in good faith conclude that he had difficulties getting along with others."); *Woods v. Newburgh Enlarged City Sch. Dist.,* 288 F. App'x 757, 760 (2d Cir. 2008) ("While Woods's claimed misunderstanding of her superior's directive helps explain her exercise of poor judgment, it does not demonstrate the falsity of this non-discriminatory reason for her discharge . . . ." (citing *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000))); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009), *aff'd* 371 F. App'x 115 (2d Cir. 2010) ("[A] plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact.").

The Plaintiff's burden at this stage is to prove that "the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n.,* 233 F.3d 149, 156 (2d Cir. 2000); *see also Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir. 2000) (courts should examine the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff") (internal citations and quotation marks omitted)). To defeat the motion for summary judgment the Plaintiff "must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by . . . discrimination." *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir. 1997).

"[T]rial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. Gen. Life. Ins. Co.,* 92 F.3d 81, 87 (2d Cir. 1996) (internal citations omitted). "Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant . . . materials are before the district court must be

carefully scrutinized for circumstantial evidence that could support an inference of discrimination." *Id.*

### c. Application to the Facts

The Defendants argue that the Plaintiff cannot make out a *prima facie* case of wage discrimination under any of the statutes, because she cannot show that males and females were paid differently according to their gender. Instead, the Defendants state that producers' commissions were based on where they had previously worked, and their gender did not affect their rate. Furthermore, they contend that even if the Plaintiff presents a *prima facie* case, the Defendants have articulated a non-discriminatory reason for why the Plaintiff was paid less. Specifically, they argue that the Plaintiff was paid less than some males because those males had worked for RC Knox, where they were given generous commission rates. Furthermore, the Defendants contend that there were also women who made more than the Plaintiff. In opposition, the Plaintiff claims that the Defendants' justification is essentially pretextual. The Plaintiff further states that since she was not a producer at the Bank of Smithtown, she should have received the higher rate that other "new producers" were paid. The Court finds that the Defendants have, at a minimum, provided a legitimate, non-discriminatory reason for any differential in pay.

At the outset, the Court takes issue with the "evidence" sought to be introduced by the parties. The Plaintiff cites to the Plaintiff's exhibit 6 repeatedly in support of her arguments here. However, as discussed above, exhibit 6 has not been authenticated by anyone. It is unclear from what source the figures in exhibit 6 are drawn, and no witness swore to its authenticity either in an affidavit or in a deposition. Similarly, in their reply memorandum of law, the Defendants created a table entitled "Women subject to the RC Knox Commission Plan." (Defs.' Reply Mem. of Law at 5 (ECF No. 77)). The table lists six women who purportedly received higher commissions under

the RC Knox Plan. However, none of the exhibits provided by either party identify the commission structures for any women besides the Plaintiff. Casey stated broadly in his affidavit that the RC Knox commission plan applied to both male producers and female producers, and that both males and females were eligible for commissions above 25% under the RC Knox plan. (Defs.' Ex. E ¶¶ 8–9). He identified one female producer, Julie Spencer, who he said "earned more in commissions [than those on the Chittenden plan] because she was on the RC Knox plan . . . ." (*Id.* ¶ 21).

The admissible evidence shows that the Plaintiff was paid a 25% commission rate from January 2011 until August 2011, when she was paid under the RC Knox commission structure. The other Bank of Smithtown producers, and the Chittenden producers were paid 25%. The producers who had previously worked for RC Knox, whether they were male or female producers, were eligible for commission rates that exceeded 25%. The RC Knox producers' rates depended on their level of production. The "business reason" advanced by the Defendants for paying the RC Knox producers a higher commission rate is that they were concerned about a negative reaction from top RC Knox producers. New producers had a separate commission structure that often included a salary. The purported reason for the separate structure was that the new producers could not survive on commissions alone because they did not have existing books of business. It is not clear from the admissible evidence what commission rates new producers were paid.

Nor does the Plaintiff identify specific producers with whom she seeks to compare herself. She only broadly states that male producers were paid higher commissions. This is insufficient to state a *prima facie* case under either the EPA or Title VII. *See Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 692 (2d Cir. 2017) (stating that the plaintiff could not rely on statistical evidence alone, that she must instead first identify a "specific male comparator" and that "[t]he *Lavin–McEleney* Court did not suggest that an EPA plaintiff could make out a *prima facie* case of

discrimination by virtue of generic evidence of pay disparities between males and females in a given company" (citing *Lavin–McEleney v. Marist Coll.*, 239 F.3d 476, 481 (2d Cir. 2001)); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (stating that in order to prevail on a Title VII claim, a plaintiff " must compare herself to employees who are similarly situated in all material respects" (internal citations and quotation marks omitted)). While she claims that Jones and Clark had retroactive raises, she offers no admissible evidence to support this claim. The Plaintiff did not testify to this, and even if she had, she would not have personal knowledge of other producers' commission rates. Casey, who would have such personal knowledge, testified in his affidavit that Jones' and Clark's raises were not retroactive. (Defs.' Ex. E ¶ 22).

In short, the Plaintiff did not introduce any evidence that compared her to any specific male producers. Therefore, the Plaintiff cannot present a *prima facie* case of wage discrimination under the EPA, Title VII, or their parallel state statutes.

While the Plaintiff belongs to a protected class and was qualified for her job, she cannot show that the Defendants paid different wages to employees of the opposite sex. Producers who had worked for RC Knox, whether they were male or female, were eligible for commission rates above 25%.

When members of a plaintiff's protected class are not subjected to the adverse employment action alleged by the plaintiff, no inference of discrimination can be drawn. *See Daniels v. Connecticut*, No. 3:12-CV-0093 VAB, 2015 WL 4886455, at *11 (D. Conn. Aug. 17, 2015) (finding that the circumstances weighed against drawing an inference of discrimination where individuals in the plaintiff's protected class were promoted even though the plaintiff was not); *Robles v. Cox & Co.*, 987 F. Supp. 2d 199, 208 (E.D.N.Y. 2013) (Spatt, J.) (stating that when the defendants retained employees who were within the plaintiff's protected class, but fired the

plaintiff, there could not be an inference of discrimination); *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395 (S.D.N.Y. 2012) (same); *see also Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 118 (2d Cir. 1991) (finding the retention of three older employees relevant to the plaintiff's age discrimination claim).

Even if the Court were to find that the Plaintiff has presented a *prima facie* case of wage discrimination, the Defendants have offered a legitimate, non-discriminatory reason for any difference in wages. The Defendants state that they had wanted to place everyone on the Chittenden plan, but they did not want to anger those producers who had become accustomed to the higher commission structures they received while at RC Knox. Every other producer, except new producers, was placed on the Chittenden plan. The Plaintiff has not been able to show that this reason is either false or pretextual.

The Plaintiff has not presented any admissible evidence to refute the Defendants' evidence that RC Knox producers were paid higher commissions because they had been previously paid at those rates. Nor has she demonstrated that, contrary to the Defendants' evidence, that male and female producers were both eligible for those higher commissions. There cannot be an inference of discrimination where members of the Plaintiff's protected class also made more money than the Plaintiff. Any claims made by the Plaintiff that only males were eligible for higher commissions are merely allegations, and are unsupported by admissible evidence.

Furthermore, the Plaintiff was paid under the RC Knox commission structure beginning in August 2011, and therefore eligible to receive the higher commission rates at that time. Her only argument on this point is that the raise should have been retroactive because Jones and Clark received retroactive raises. As stated above, the Plaintiff does not offer any admissible evidence to support this contention.

Therefore, the Court finds that the Defendants have articulated a legitimate non-discriminatory reason for why the Plaintiff was paid a lower commission than certain male producers. Her rate was the same as male producers who had come from her previous employer, as well as male producers from another location. Furthermore, the higher commission rates were available to both female and male producers who had worked at RC Knox. The Plaintiff has not presented any evidence to demonstrate that the Defendants' proffered reason for her commission rate was pretextual. *See St. Mary's Honor Ctr.*, 509 U.S. at 515 ("[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (internal citations and quotation marks omitted, italics in original)); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988) (stating that a plaintiff may still prevail "upon a showing that the employer's given legitimate reason is unworthy of credence, that the reason supplied was not the true reason for the unfavorable employment decision.").

As to the Plaintiff's claim that she should have been paid as a new producer, the Court finds that her argument fails on two fronts. First, the Plaintiff testified that although she was not a producer at the Bank of Smithtown, she had "function as a producer" there, and had a book of business in excess of $1 million. (Pl.'s Ex. 5 ¶¶ 8–9). Second, the Plaintiff has not identified any male new producers who made more money than she did. In fact, the only admissible evidence shows that the Plaintiff made more than new producers. (Defs.' Ex. E ¶ 10). *See Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30–31 (2d Cir. 2015) (stating that plaintiffs must allege that she made *less* money than those outside of her protected class due to discrimination). Therefore, the Plaintiff cannot succeed on her disparate pay claim on this basis.

Therefore, the Court finds that the Defendants have produced a legitimate, non-discriminatory reason for why the Plaintiff was paid 25% commission from January 2011 until August 2011. The record does not reveal any facts from which a jury could conclude that the Defendants' reasons were not worthy of belief. Accordingly, as this reason demonstrates that "the differential [was] based on any other factor other than sex," 29 U.S.C. § 206(d)(1), the Defendants' motion for summary judgment dismissing the Plaintiff's Title VII, NYSHRL and EPA wage discrimination claims is granted.

### 3. As to the Plaintiff's Retaliation Claims

The Defendants contend that the Plaintiff cannot maintain her retaliation claims because she cannot establish a causal connection between any adverse action and a protected activity, and because they have given a legitimate, non-retaliatory reason for her termination. The Plaintiff claims that she engaged in many protected activities and was subjected to several adverse employment actions that were sufficiently close in time.

Retaliation claims under Title VII are also assessed using the burden-shifting framework laid out in *McDonnell Douglas*, 411 U.S. at 802. *See Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under [] Title VII") (citing *Schiano,* 445 F.3d at 609).

In order to establish a *prima facie* case of retaliation, a plaintiff must establish "(1) [he] engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir. 2012)); *see also Summa,* 708 F.3d at 125; *Schiano,* 445 F.3d

at 608. The fourth "element requires a plaintiff to show a causal connection between the protected activity and the adverse employment action. Such a causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse employment action." *Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (internal citations and quotation marks omitted). It can also be shown directly through evidence of retaliatory animus. *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990).

"The burden at the summary judgment stage for Plaintiff is minimal and *de minimis,* and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013)).

### a. As to whether the Plaintiff presents a *prima facie* case of retaliation

On December 7, 2012, the Plaintiff filed her complaint with the NYSDHR, which is a protected activity under Title VII and the NYSHRL. There is no dispute that the Defendants were aware of the Plaintiff's filing.

Although the Plaintiff claims that she was subjected to several adverse employment actions, not every slight from an employer is actionable under Title VII. To be "materially adverse," a plaintiff's working conditions must undergo a change "more disruptive than a mere inconvenience or an alteration in job responsibilities." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Pimentel v. City of N.Y.,* No. 00 Civ. 326, 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) (internal citations and quotation marks omitted).

Therefore, none of the following employment actions constitute materially adverse employment action: transferring the Plaintiff's leadership of a sales team, which was a voluntary position that did not affect her pay, to a different area; not bringing the Plaintiff to an internal networking meeting; not receiving adequate marketing representative support; and searching the Plaintiff's emails. Furthermore, the actions taken by the Defendants after the Plaintiff was terminated are not adverse employment actions, because the Plaintiff was no longer employed at People's United. However, the Plaintiff's termination is, as a matter of law, a materially adverse employment action. The Plaintiff was terminated on August 19, 2013.

The Plaintiff was terminated a little more than eight months after she filed her NYSDHR complaint. The Defendants contend that eight months, which they count as nine months, is too temporally distant as a matter of law to find retaliation causation. The Court disagrees.

While there is no bright line establishing how far removed an adverse employment action must be taken after a protected activity to no longer raise an inference of discrimination, the Court finds that the passing of eight months here does not destroy the inference of retaliation. Courts in the Second Circuit have been willing to find a factual issue regarding causation for up to a year between the protected activity and the adverse action under certain circumstances. *See, e.g., Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir. 1980) (8 month gap between filing of EEOC complaint and retaliatory action suggested a causal relationship); *Summa*, 708 F.3d at 125 ("The seven-month gap between [plaintiff's] filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote." (internal citations omitted)); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[F]ive months is not too long to find the causal relationship." (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.,* 252 F.3d 545, 555 (2d Cir. 2001)); *Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 105, 121 (D. Conn. 2006)

("[M]any courts have found that time periods of 6 months to a year between the time of the protected conduct and the time of the adverse employment action suggest a causal relationship between the two." (internal citations and footnote omitted)); *Suggs v. Port Authority of N.Y. & N.J.,* 97civ4026 (RPP), 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (termination six months after plaintiff filed an EEOC charge was "sufficiently close in time to raise an inference of retaliation"); *Bernhardt v. Interbank of N.Y.,* 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (eleven months between protected activity and termination might suggest causal link where defendant had reasons for delaying termination); *cf. Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 274, 121 S. Ct. 1508, 149 L .Ed. 2d 509 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all.") (per curiam); *Woodworth v. Shinseki*, 447 F. App'x 255, 258 (2d Cir. 2011) (finding fifteen months and eighteen months to far removed to support an inference of retaliation); *Richardson,* 180 F.3d at 447 (two year gap between complaint and discharge insufficient to prove causation).

Furthermore, the Plaintiff filed a rebuttal brief with the NYSDHR on February 21, 2013, which was less than six months before she was terminated. "[P]rotected activities include not only the filing but also the prosecution of a retaliation lawsuit." *Grant v. United Fed'n of Teachers*, No. 12-CV-02149 CBA VMS, 2014 WL 978444, at *13 (E.D.N.Y. Mar. 12, 2014) (retaliation under the ADA) (citing *Infantolino v. Joint Indus. Bd. of Elec. Indus.,* 582 F. Supp. 2d 351, 359 (E.D.N.Y. 2008) (citing to Title VII)).

Finally, as the Plaintiff points out, there is some evidence of direct retaliatory animus. Barnes, the CEO of PUB, said in an email:

> As long as we do not let too much time go by before we fire her for [] her actions as I know them and file claims for the cost we have incurred defending her charges. I want to be very, very aggressive in this situation. She has cost us a lot of management time and expense and we need to be compensated.

(SMF ¶ 161). In the Court's view, a reasonable juror could conclude that Barnes was motivated, at least in part, by retaliatory animus in terminating the Plaintiff. The email shows that he was resentful that PUB had to defend against the Plaintiff's discrimination claims.

Therefore, the Court finds that the Plaintiff has presented sufficient evidence of a causal connection.

The Defendants argue that there was an intervening event—the Plaintiff's consulting work for another agency—that defeats her *prima facie* case. *See, e.g., Rivera v. Thurston Foods, Inc.,* 933 F. Supp. 2d 330, 342 (D.Conn. 2013) ("[T]his intervening event dispels an inference of a causal relationship between the protected activity and Plaintiff's termination, thus defeating Plaintiff's *prima facie* case of unlawful retaliation."); *Yarde v. Good Samaritan Hosp.,* 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("In this Circuit, an inference of causation is defeated . . . if . . . there was an intervening causal event.").

However, in the Court's opinion, this is instead the Defendants' proffered reason for her termination, and more properly analyzed at the second and third steps of the *McDonnell Douglas* framework.

Therefore, the Court finds that the Plaintiff has presented sufficient evidence of a *prima facie* case of retaliation.

### b. As to the Defendants' Proffered Legitimate, Non-retaliatory Explanation for the Plaintiff's Termination

In July 2013, the Defendants reviewed the Plaintiff's emails. This review eventually lead to the discovery that the Plaintiff and Mulvey were consulting at another firm. The Defendants terminated both of them, and the Defendants state that they were terminated because they had

consulted for another firm and were stealing company information. Therefore, the Defendants have met their burden at the second step of the *McDonnell Douglas* framework.

### c. As to whether the Defendants' Proffered Reason for the Plaintiff's Termination is Pretextual

The Defendants argue that the Plaintiff cannot show that her termination was pretextual because she broke company rules and because Mulvey, a male producer who had not filed a complaint, was also terminated. While the Plaintiff did not brief this issue, the Court may consider evidence offered by the Plaintiff in support of her *prima facie* case. *See Zann Kwan*, 737 F.3d at 847 (stating that while temporal proximity alone is insufficient to show pretext, "a plaintiff may rely on evidence comprising her *prima facie* case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage"). The Court finds that sufficient factual questions exist as to whether a retaliatory motive played a part in the Plaintiff's termination.

Although it is clear that retaliation was not the only reason for the Plaintiff's termination, the temporal proximity of her termination to her NYDHR complaint, coupled with Barnes' email which shows retaliatory intent, are sufficient for a reasonable juror to plausibly find that retaliation was a substantial reason for the Plaintiff's termination. *See Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 126 (2d Cir. 2008) ("Richardson can survive summary judgment if she can show that an issue of fact exists as to whether 'a retaliatory motive *played a part* in the adverse employment actions even if it was not the sole cause.'" (quoting *Sumner,* 899 at 209).

Furthermore, the impetus for the search of the emails reveals further questions of fact and credibility. Although Tengel testified that it was routine to search emails for employees who were departing, the Plaintiff had not given any notice that she was leaving. Tengel had also referenced

a "litigation situation" with the Chief Information Security Officer. However, the only litigation situation at the time was the Plaintiff's discrimination action. While it may also be true that PUIA was considering litigation against the Plaintiff for her alleged theft of corporate knowledge, a reasonable juror could conclude that Tengel was referring to the discrimination "litigation situation." To that end, Michael Collier, the Chief Operating Officer at PUIA, testified that he was tasked with reviewing the Plaintiff's emails, and that he had never been previously asked to perform such a review.

Therefore, the Court finds that the Plaintiff has met her burden in demonstrating that retaliation "was at least one of the motivating factors," *Holcomb*, 521 F.3d at 138 (internal citations and quotation marks omitted), in the Defendants' decision to terminate the Plaintiff. The Defendants did not address the Plaintiff's retaliation claims against the individual Defendants, and therefore the Court does not address those claims at this time. Accordingly, the Defendants' motion for summary judgment on the Plaintiff's Title VII and NYSHRL retaliation claims pursuant to Rule 56 is denied.

### 4. As to the Plaintiff's NYLL Wage Claims

The Defendants argue that the Plaintiff's NYLL wage claims cannot be sustained because PUIA had provided her with a written agreement that stated that her commissions would only accrue until she was terminated; that if she was not bound by the written agreement, then the Statute of Frauds bars an oral agreement to post-termination commissions; and she cannot overcome the presumption that she is not entitled to post-termination commissions. In opposition, the Plaintiff contends that since she did not sign the written agreement, the law entitles to her a presumption in her favor regarding the disputed terms; industry standards dictate that she receive the commissions; and that she is entitled to her commissions under the law. The Court finds that

the Plaintiff cannot overcome the presumption that she is not entitled to post-termination commissions because she did not introduce any evidence of a clear intent of the parties that she should receive them.

Under the NYLL, the Plaintiff was entitled to receive commissions "in accordance with the agreed terms of employment . . . ." N.Y. LAB. LAW § 191(1)(c). The statute further provides that:

> [t]he agreed terms of employment shall be reduced to writing, . . . . Such writing shall include a description of how wages, salary, drawing account, commissions and all other monies earned and payable shall be calculated. . . . Such writing shall also provide details pertinent to payment of wages, salary, drawing account, commissions and all other monies earned and payable in the case of termination of employment by either party. The failure of an employer to produce such written terms of employment, *upon request of the commissioner*, shall give rise to a presumption that the terms of employment that the commissioned salesperson has presented are the agreed terms of employment."

*Id.* (emphasis added).

The Plaintiff provides no case law, and a search by the Court did not reveal any authority, which would support her claim that she is entitled to the above presumption because she did not have a written employment agreement.

Rather, the evidence shows that the Plaintiff signed the Production Sheet, which contained the terms of her commission. Then, she and Casey orally agreed that the terms of her commission would be changed to reflect the rates in the RC Knox plan. Later, the Defendants provided the Plaintiff with a contract that she did not sign. This contract included a provision stating that the Plaintiff would not be paid commissions upon termination. In the Court's view, these documents satisfy the requirements of N.Y. LAB. LAW § 191(1)(c). Although the Plaintiff did not sign the contract, "case law dictates that when parties have an employment contract terminable at will, the contract can be modified and different compensation rates fixed without approval of the other party

since the dissatisfied party has a right to leave his employment." *Campeggi v. Arche Inc.*, No. 15 CIV. 1097 (PGG), 2016 WL 4939539, at *6 (S.D.N.Y. Sept. 14, 2016) (citing *Gen. Elec. Tech. Servs. Co. v. Clinton*, 173 A.D.2d 86, 88 (3d Dept. 1991); *Kronick v. L.P. Thebault Co.*, 70 A.D.3d 648, 648 (2d Dept. 2010); *Int'l Paper Co. v. Suwyn*, 951 F. Supp. 445, 448 (S.D.N.Y. 1997)). This means that if an employer changes the terms of an at-will employee's contract, "and the employee chooses to remain in the employer's employ after being advised of that change, the employee is deemed to have acquiesced to the new terms of employment . . . ." *Campeggi*, 2016 WL 4939539, at *6.

However, the Court need not reach the issue of whether the Plaintiff was bound by the terms of the unsigned contract, because case law is clear that absent clear expressed intent by the parties, an at-will employee is not entitled to post-termination commission. *Bloom v. Rock*, No. 06 CIV. 6301(NRB), 2010 WL 2267468, at *4 (S.D.N.Y. May 27, 2010) ("[A]n at-will sales representative is entitled to post-discharge commissions only if the parties' agreement expressly provided for such compensation[.]" (quoting *Prod. Prods. Co. v. Vision Corp.*, 270 A.D.2d 922, 922, 706 N.Y.S.2d 289, 291 (4th Dep't 2000)); *Peter Lampack Agency, Inc. v. Grimes*, 93 A.D.3d 430, 430, 939 N.Y.S.2d 409, 410 (1st Dep't 2012) (same); *Swits v. New York Systems Exchange Inc.,* 722 N.Y.S.2d 300, 302 (3d Dep't 2001) (same); *see also Soviero v. Carroll Grp. Int'l, Inc.*, 27 A.D.3d 276, 277, 813 N.Y.S.2d 49, 50 (1st Dep't 2006) ("Plaintiff was no longer an employee or a commission salesman of the brokerage firm after her termination, such as would entitle her to wages or a commission" (internal citations and quotation marks omitted)).

The Plaintiff has not introduced any evidence of such clear expression of intent. The sole evidence upon which the Plaintiff relies is that when she was terminated, HR Manager Deborah Gross purportedly told her that she would continue to receive her commissions "as usual," despite

her termination.  (Pl.'s Ex. 5 ¶ 60).  This does not amount to a clear expression of intent for the parties to pay her post-termination commissions.  Furthermore, as discussed below, an oral agreement to pay the Plaintiff post-termination commissions would be barred by the New York Statute of Frauds.  She has also introduced almost a dozen affidavits of salespersons who say that such payments are standard in the insurance industry, but that does not equate to a mutual agreement or an expression of intent.

As the Plaintiff admits, at best the evidence shows that the parties did *not* agree on whether the Plaintiff would receive post-termination commissions.  It is clear from the unsigned contract that PUIA did not want to pay her post-termination commissions.

Therefore, as a matter of law, the Court finds that the Plaintiff is not entitled to post-termination commissions because there is no evidence that the parties expressly agreed to such an arrangement.  Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's NYLL wage claim for post-termination commissions is granted.

### 5.  As to the Plaintiff's Breach of Contract Claim

The Defendants argue that since there was no agreement to pay post-termination commissions, there cannot be a breach of contract.  The Plaintiff again contends that there was such an agreement.  For the reasons stated above, the Court finds that the Plaintiff's breach of contract claims cannot be sustained.

Under New York law, there are four elements in a breach of contract claim: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996).

The Plaintiff's breach of contract claim is entirely predicated on her allegation that there was an agreement to pay her post-termination commissions. As stated above, the Plaintiff has not introduced any evidence of such an agreement. The Plaintiff has not identified with whom she allegedly made this agreement, when it was made, or any of the terms of the agreement.

Furthermore, the Statute of Frauds bars an oral agreement for post-termination commissions where the payments could continue for more than a year. The New York Statute of Frauds states:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . . .

N.Y. GEN. OBLIG. LAW § 5-701.

Courts have consistently found that the Statute of Frauds applies where, as here, a plaintiff brings a breach of contract action for alleged unpaid post-termination commissions based on an oral contract. *See Komlossy v. Faruqi & Faruqi, LLP*, No. 15 CIV. 9316 (KPF), 2017 WL 722033, at *7 (S.D.N.Y. Feb. 23, 2017) ("[T]he Firm's commission liability endures beyond Plaintiff's termination and continues indefinitely so long as the Firm earns fees from a client that Plaintiff first generated. The oral Agreement is not fully performable within a year and, so, void under the Statute of Frauds."); *Levine v. Zadro Prod., Inc.*, No. 02 CIV.2838 GBD, 2003 WL 21344550, at *2 (S.D.N.Y. June 9, 2003) ("[T]he Statute of Frauds applies and bars the enforcement of an agreement for ongoing post-termination commissions." (citing *Martocci v. Greater New York Brewery,* 301 N.Y. 57, 92 N.E.2d 887, 889 (N.Y. 1950)); *Zupan v. Blumberg*, 2 N.Y.2d 547, 552, 141 N.E.2d 819, 822 (N.Y. 1957) (finding that the Statute of Frauds applied where the plaintiff alleged that the defendants had to pay him commissions on any account he had brought in);

*Guterman v. RGA Accessories*, 196 A.D.2d 785 (1st Dep't 1993) ("The indefinite promise to pay commissions on all future sales is clearly within the Statute [of Frauds]") (internal citation omitted); *Apostolos v. R.D.T. Brokerage Corp.,* 559 N.Y.S.2d 295, 297 (1st Dep't 1990) ("[A] promise to pay commissions that extends indefinitely, dependent solely on the acts of a third party and beyond the control of the defendant, is within the Statute and must be in writing.").

The *Levine* Court summed up the Plaintiff's situation:

> As is demonstrated by [the] plaintiffs' position in this case, even when defendants terminate their employment relationship with plaintiffs, their obligation to pay commissions would endure. Commissions must be paid so long as orders placed by certain customers are accepted. Even if these clients do not place orders in a given year, they may do so in the future and plaintiffs would continue to be entitled to commissions on those later orders . . . . Accordingly, New York courts have consistently found the Statute of Frauds to apply where such commission agreements are involved.

2003 WL 21344550, at *5.

Even if the post-termination commissions would only continue until the expiration of the non-compete agreement, as many of the Plaintiff's witnesses' claimed in their affidavits, the Plaintiff agreed in the Purchase Agreement to not compete for three years after her termination. Therefore, the commissions would still have to be paid for longer than one year, and the Statute of Frauds forbids such an oral agreement.

Therefore, the Court finds that the Statute of Frauds bars the Plaintiff's breach of contract claims as a matter of law. Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's breach of contract claims is granted.

### 6. As to the Plaintiff's Unjust Enrichment Claim

"'The theory of unjust enrichment lies as a quasi-contract claim' and contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'" *Georgia Malone & Co., Inc. v. Rieder,* 19 N.Y.3d 511, 516, 950 N.Y.S.2d 333, 336,

973 N.E.2d 743, 746 (N.Y. 2012) (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 907 N.E.2d 268 (N.Y. 2009)).

An unjust enrichment claim is rooted in "the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337 (N.Y. 1916). Thus, in order to adequately plead such a claim, the Plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (N.Y. 2011) (brackets and internal quotation marks omitted).

Under New York law, there can be no cause of action for unjust enrichment when there is a valid contract governing the same subject matter between the parties. *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (N.Y. 1987). "[T]he existence of a valid and binding contract governing the subject matter at issue in a particular case does act to preclude a claim for unjust enrichment even against a third party non-signatory to the agreement." *Network Enters., Inc. v. Reality Racing, Inc.,* No. 09 Civ. 4664, 2010 WL 3529237, *7 (S.D.N.Y. Aug. 24, 2010) (quoting *Law Debenture v. Maverick Tube Corp.,* No. 06 Civ. 14320, 2008 WL 4615896, *12 (S.D.N.Y. Oct. 15, 2008) (collecting cases)). "Courts have permitted pleading in the alternative in the face of a written agreement, however, when there is a dispute as to the agreement's validity or enforceability." *Air Atlanta Aero Engineering Ltd. v. SP Aircraft Owner I, LLC,* 637 F. Supp. 2d 185, 195 (S.D.N.Y. 2009) (citations omitted).

While the Statute of Frauds does not automatically bar a claim of unjust enrichment, it does so in instances such as this one, where the Plaintiff's unjust enrichment claims depend on a supposed agreement between the parties. *Komlossy*, 2017 WL 722033, at *9 ("[W]hile alternative

pleading of contract and unjust enrichment claims is generally permissible . . . 'there are exceptions, and this case involves one of them: A party may not circumvent the Statute of Frauds by repleading an already barred breach of contract claim as a claim for unjust enrichment.'" (quoting *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 412-13 (S.D.N.Y. 2016))); *Levine*, 2003 WL 21344550, at *5 ("Plaintiff's theory of unjust enrichment, therefore, depends on proof of the parties' oral agreement. Because that agreement is barred by the Statute of Frauds, plaintiffs' additional claims must also barred." (internal citations omitted)); *Talini v. Bus. Air, Inc.*, 148 A.D.2d 828, 830-31 (3d Dep't 1989) ("[P]laintiff's claim that he was denied commissions which he was entitled to under a theory of unjust enrichment depends on proof of the oral contract and therefore is also barred by the Statute of Frauds.").

Therefore, the Plaintiff's unjust enrichment claims are also barred by the Statute of Frauds. Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's unjust enrichment claims are granted.

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment pursuant to Rule 56 is granted in part and denied in part. It is granted to the extent that the following claims are dismissed: the Plaintiff's wage discrimination claims brought pursuant to Title VII, NYSHRL and EPA; the Plaintiff's NYLL wage claim; her breach of contract claim; and her unjust enrichment claim. It is denied to the extent that the following claims survive: the Plaintiff's hostile work environment claims brought pursuant to Title VII and the NYSHRL; the Plaintiff's termination discrimination claims brought pursuant to Title VII and the NYSHRL; and the Plaintiff's retaliation claims brought pursuant to Title VII and the NYSHRL.

As previously directed by the Court, the parties are to file a joint pretrial order within fourteen days of the issuance of this order.

It is **SO ORDERED:**

Dated: Central Islip, New York

August 7, 2017

_/s/ Arthur D. Spatt_

ARTHUR D. SPATT

United States District Judge